Thomas P. Smith, Jr.
Alison Conn
Todd D. Brody
Wesley W. Wintermyer
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0080 (Brody)
brodyt@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>   -against-<br><br>DEREK R. TALLER,<br><br>       Defendant. | <u>COMPLAINT</u><br><br>25 Civ. 3537 (  )<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Defendant Derek R. Taller ("Taller"), alleges as follows:

## SUMMARY

1. Between January 2020 and October 2022 (the "Relevant Period"), Taller engaged in persistent and egregious fraudulent conduct while managing and advising two separate investment vehicles—an unregistered fund, Vision BioBanc Holdings, LLC ("Vision Holdings"), and a business development company, StHealth Capital Investment Corporation ("StHealth Capital").

2. During 2020, while Chief Executive Officer ("CEO") of Vision Holdings, Taller disseminated offering documents to prospective investors containing multiple material misrepresentations concerning the oversight and supervision of Vision Holdings, including: (1) that

Vision Holdings' investment objectives and portfolio valuations would be subject to supervision by Vision Holdings' Board of Directors; (2) that Vision Holdings' financial statements would be audited by one of the "Big Four" accounting firms ("Accounting Firm A"), which it named; and (3) that the auditor's work would be reviewed by Vision Holdings' Audit Committee.  In fact, Vision Holdings operated without a functioning Board of Directors for more than a year and a half after it started raising money from investors, never engaged an independent auditor, and did not have an audit committee.  Taller had ultimate authority over these offering documents.

3.     In addition, as an investment adviser to both Vision Holdings and StHealth Capital, Taller owed these clients fiduciary duties to act in their best interests, employ reasonable care to avoid misleading them, and not engage in self-dealing.  During the Relevant Period, Taller repeatedly breached his fiduciary duties to Vision Holdings and StHealth Capital.

4.     While serving as both CEO of StHealth Capital and Chairman of its Board of Directors, Taller misappropriated at least $280,000 from StHealth Capital by charging it improper expenses incurred by companies he solely controlled.  In order to repay that money to StHealth Capital, Taller in turn misappropriated at least $300,000 (the aforementioned sum plus interest) from Vision Holdings.  Separately, he misappropriated another $200,000 from Vision Holdings, bringing his total misappropriations from StHealth Capital and Vision Holdings to at least $500,000.

5.     Taller also engaged in a course of fraudulent conduct and self-dealing that involved both StHealth Capital and Vision Holdings.  Taller directed both StHealth Capital and Vision Holdings to make loans to a company in which Taller, through a trust established nominally in the name of his family members, had secretly obtained an interest only days before ("Company A").  And Taller continued to direct Vision Holdings to make loans to Company A and its affiliates (in total exceeding $21 million), all while secretly deepening his interests in them.  Company A

ultimately defaulted on its loans from StHealth Capital and Vision Holdings, resulting in total losses to StHealth Capital and Vision Holdings in excess of $21 million.

6.      By intentionally engaging in the fraudulent conduct described in this Complaint, Taller violated the federal securities laws as described below.

## VIOLATIONS

7.      By virtue of the foregoing conduct and as alleged further herein, Defendant Taller has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2) ], and Section 57(a)(4) of the Investment Company Act of 1940 ("ICA") [15 U.S.C. § 80a-56(a)] and Rule 17d-1 thereunder [17 C.F.R. § 270.17d-1].

8.      Unless Defendant is permanently restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b), 20(d), 20(e) [15 U.S.C. §§ 77t(b), 77t(d), and 77t(e)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)], and ICA Sections 42(d) and 42(e) [15 U.S.C. §§ 80a-41(d) and 80a-41(e)].

10.      The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and

21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)], and ICA § 42(e) [15 U.S.C. § 80a-41(e)]; (d) permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], Advisers Act Section 214 [15 U.S.C. § 80b-14], ICA Section 44 [15 U.S.C. § 80a-43], and 28 U.S.C. § 1331.

12.    Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], Advisers Act Section 214 [15 U.S.C. § 80b-14], and ICA Section 44 [15 U.S.C. § 80a-43], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this judicial district.  For example, during all relevant times, the principal offices of StHealth Capital, its external investment adviser, StHealth Capital Advisors, LLC ("StHealth Advisors"), and Vision Holdings' external investment adviser, Vision Bio Advisors, Ltd. ("Vision Advisors"), were all located in Manhattan.  In addition, Taller resided in Manhattan when he engaged in many of the acts described in this Complaint.

## DEFENDANT

14.    **Taller**, age 54, resided in New York City while engaging in the fraudulent conduct described herein but, upon information and belief, currently resides outside the United States.  Taller is the former CEO of StHealth Capital and Chairman of its Board of Directors, as well as the CEO of StHealth Capital's external investment adviser, StHealth Advisors.  In addition, Taller is the former CEO of Vision Holdings and Chairman of its Board of Directors, as well as the CEO of Vision Holdings' external investment adviser, Vision Advisors.  At various times, Taller held other titles, such as StHealth Capital's Chief Compliance Officer, Anti-Money Laundering Officer, interim Chief Financial Officer ("CFO"), Treasurer, and Secretary.  Taller is the sole owner of StHealth Advisors, Vision Advisors, Consorcia Management LLC, and VBB Management Advisory LLC.

## OTHER RELEVANT ENTITIES

15.    **StHealth Capital** is a Maryland corporation that began operating on February 16, 2017.  StHealth Capital, whose principal place of business is New York City, was an externally managed, non-diversified, closed-end management investment company.  In 2015, StHealth Capital elected to become a business development company pursuant to ICA Section 54(a) [15 U.S.C. § 80a–53(a)].[1]  On March 13, 2018, Taller acquired StHealth Advisors and was appointed CEO of StHealth Capital.  Taller served as StHealth Capital's CEO from March 14, 2018 to May 28, 2022, and as StHealth Capital's interim CFO, Treasurer, and Secretary from December 4, 2020 to approximately May 28, 2022.  Taller also has served as an interested member of StHealth Capital's Board of Directors since June 29, 2018, and he served as its Chairman from June 29, 2018 to June

---

[1] A business development company is a closed-end company that elects to be subject to certain provisions of the ICA without having to register as an investment company.  *See* 15 U.S.C. § 80a-53(a).  A closed-end company does not issue redeemable securities and does not continuously offer its shares for sale.  *See* 15 U.S.C. § 80a-5(a).  Closed end companies thus differ from mutual funds, which are open-end companies.

24, 2022.  After Taller acquired StHealth Advisors, StHealth Capital offered and sold securities from approximately March 2019 to February 2022 pursuant to a registration statement filed with the SEC. During that time, StHealth Capital raised approximately $7.5 million from investors.  On October 6, 2023, as a result of StHealth Capital failing to file periodic reports with the Commission, the Commission revoked the registration of StHealth Capital's securities.  In January 2025, StHealth Capital withdrew its election to be a BDC.  As of the date of this Complaint, StHealth Capital has dissolved and is in the process of winding down.

16.    **StHealth Advisors** is a Delaware limited liability company, formed in 2014, with its principal place of business in New York City.  At all relevant times, StHealth Advisors was the unregistered external investment adviser to StHealth Capital, with which it had an advisory agreement until StHealth Capital terminated the agreement on May 13, 2023.  Taller, through a wholly owned entity, acquired complete ownership of StHealth Advisors on March 13, 2018.  Taller is StHealth Advisors' manager and, in practice, was its sole provider of investment advice to StHealth Capital: it is an alter ego of Taller.  Under the advisory agreement, StHealth Advisors was compensated for its services through reimbursement of expenses and a base asset management fee and, if applicable, an incentive fee based on performance.  StHealth Capital never paid StHealth Advisors a management fee or incentive fee, but it did reimburse StHealth Advisors—or related companies that Taller also owned—for expenses purportedly incurred on behalf of StHealth Capital between approximately May 2019 and January 2022.

17.    **Vision Holdings** was incorporated in Puerto Rico in 2019 and, at all relevant times, operated in New York City.  Vision Holdings was formed for the stated purpose of making loans and providing debt financing to healthcare-related companies.  Vision Holdings' private placement memoranda ("PPMs") also stated that Vision Holdings anticipated establishing or acquiring one or more banks.  Vision Holdings never established or acquired any banks.  Between approximately

January 2020 and April 2022, Vision Holdings raised approximately $48.6 million by offering and selling securities pursuant to notices filed with the SEC that claimed exemption from registration under Securities Act Rule 506(c) [17 CFR § 230.506(c)]. Taller served as a member of Vision Holdings' Board of Directors from December 30, 2019 to January 1, 2024, including as its Chairman from August 13, 2021 to January 1, 2024. Taller served as Vision Holdings' CEO from December 21, 2019 to January 1, 2024.

18.     **Vision Advisors** is a Cayman Islands corporation, incorporated in 2020, with its principal place of business in New York City. Taller is the sole owner and officer of Vision Advisors and was the sole provider of investment advice to Vision Holdings: it is an alter ego of Taller. Vision Advisors served as the external adviser to Vision Holdings pursuant to an investment advisory agreement, effective as of March 31, 2020. Under the advisory agreement, Vision Advisors was compensated for its services through reimbursement of expenses, a base asset management fee and, if applicable, an incentive fee based on performance. Between 2020 and 2023, Vision Holdings paid entities owned by Taller, which were affiliates of Vision Advisors, more than $1.6 million in management fees and expense reimbursement.

19.     **Consorcia Management LLC ("Consorcia")** is a Delaware limited liability company formed in 2013. Taller is the sole member (*i.e.,* owner) of Consorcia: it is his alter ego.

20.     **VBB Management Advisory LLC ("VBB Management")** is a Delaware limited liability company formed in 2021. Taller is the sole member (*i.e.,* owner) of VBB Management: it is his alter ego.

21.     **The Trust** is a Delaware irrevocable trust created by Taller on or about May 1, 2020. Taller's children are the beneficiaries of The Trust.

22.     **Company A** is a Delaware limited liability company formed in 2019 with its principal place of business in Florida. Company A's stated focus was on developing technologies in

the fields of healthcare and mobile patient monitoring.

23.    **Company B** is a Florida limited liability company formed in 2015 with its principal place of business is in Florida.  Company B was an affiliate of Company A.

24.    **Company C** is a Delaware limited liability company formed in 2020 with its principal place of business in Florida.  Company C is a wholly-owned subsidiary of Company A.

**FACTS**

**I.    TALLER DIRECTED VISION HOLDINGS TO DISSEMINATE OFFERING DOCUMENTS TO INVESTORS CONTAINING MATERIAL MISREPRESETATIONS**

25.    Between January 19, 2020 and November 16, 2020, while Vision Holdings' CEO, Taller directed the Fund to disseminate offering documents, specifically Vision Holdings' PPMs, which described its offering of securities to prospective investors.

26.    Taller had ultimate authority over the statements in the PPMs.  Taller received draft PPMs and directed Vision Holdings employees to send the final PPMs to prospective investors and to the placement agent for Vision Holdings' offering.  As Vision Holdings' CEO and Chairman of its Board of Directors (which had no functioning role as a board until August 1, 2021), Taller was the sole person authorized to approve such investor communications.

27.    Each Vision Holdings investor received a PPM and was required to confirm in writing that he or she had reviewed the PPM prior to investing in Vision Holdings.

**A.    Material Misrepresentations Concerning Vision Holdings' Board of Directors**

28.    Vision Holdings' PPMs represented that the Fund would be subject to the overall supervision and oversight by a Board of Directors; that the majority of the Board's members would be non-affiliated with Vision Advisors; and that the Board would supervise the work of Vision Advisors.

29.    Thus, starting with its January 19, 2020 PPM, Vision Holdings informed investors that Vision Advisors would be "[s]ubject to the overall supervision of" Vision Holdings' Board of Directors.

30.    The January 19, 2020 PPM further stated that Vision Holdings' "business and affairs are managed under the direction of the Board of Directors," which, among other things, was responsible for "oversight" of Vision Holdings' "investment activities, the quarterly valuation of its assets, oversight of its financing arrangements and corporate governance activities."

31.    The January 19, 2020 PPM also stated that Vision Advisors would "work closely with the Board" to monitor Vision Holdings' investment portfolio and exit opportunities.

32.    The January 19, 2020 PPM further stated that the Board of Directors would review the performance of investments "on a quarterly basis" and value its loans and other financial instruments "at the end of each calendar quarter."

33.    The January 19, 2020 PPM identified by name the five purported members of the Board of Directors and provided a biography for each.  According to the PPM, the Board of Directors consisted of Taller, one other Vision Holdings officer (who served as CFO and COO of Vision Holdings), and three non-affiliated directors (including a former state senator).  The PPM stated that each named person had been a "Director Since" 2019—*i.e.*, Vision Holdings' founding.

34.    Those representations corresponded with Vision Holdings' founding documents. On December 30, 2019, Vision Holdings' sole incorporator adopted a resolution purporting to elect the five aforementioned directors "to serve until the first annual meeting of Shareholders, and until their successors are duly elected and qualify."

35.    In reality, however, the January 19, 2020 PPM's representations about the board were false.  Despite purportedly being "elected" to the board in December 2019, the three non-affiliated directors had no working relationship with Vision Holdings at the time.  In fact, the three

non-affiliated directors named in the January 19, 2020 PPM did not even know that they had been appointed to Vision Holdings' Board of Directors and never attended any board meetings (until one of them joined the Board of Directors in August 2021).

36.    At Taller's direction, through mid-November 2020, Vision Holdings continued to disseminate PPMs falsely representing that Vision Holdings had a functioning five-member Board of Directors.  These PPMs, dated June 24, 2020 and August 26, 2020, contained similar misrepresentations regarding the composition of the Board of Directors and its supervision and oversight of Vision Advisors.

37.    On November 17, 2020, Vision Holdings issued a revised PPM that first represented that "activat[ion]" of the Board of Directors was contingent on the issuance of license to operate a bank by Puerto Rican regulators, which had not yet occurred.

38.    Thus, from January 19, 2020 to November 16, 2020, Vision Holdings' PPMs represented the existence of a functioning Board of Directors.

39.    Those representations were false.  Until August 1, 2021, Vision Holdings effectively operated without a Board of Directors as Taller was singlehandedly managing Vision Holdings and advising it through Vision Advisors without any independent supervision or oversight.  There was no Board of Directors performing supervisory or oversight functions, as represented in the PPMs.

40.    Between January 19, 2020 and November 16, 2020—while the PPMs falsely represented that a supervising Board of Directors was in place—investors invested more than $22 million in Vision Holdings.

41.    The fact that Vision Holdings did not have a Board of Directors or supervision or oversight of Taller and Vision Advisors was information that reasonable investors would have wanted to know before making an investment in Vision Holdings.

**B.      Material Misrepresentations Concerning Vision Holdings' Auditors and Audit Committee**

42.      The January 19, 2020 PPM stated that Vision Holdings' "Auditors" were Accounting Firm A, one of the "Big Four" accounting firms.

43.      The January 19, 2020 PPM further stated that Accounting Firm A's work would be reviewed by an "Audit Committee" of Vision Holdings' Board of Directors.

44.      The January 19, 2020 PPM named three purported members of the Audit Committee, none of whom were Taller.

45.      The January 19, 2020 PPM's representations regarding Accounting Firm A and the "Audit Committee" were false.

46.      In fact, Vision Holdings had neither engaged Accounting Firm A nor even contacted Accounting Firm A regarding auditing services.

47.      In addition, Vision Holdings had no Audit Committee, as it had no functioning Board of Directors.

48.      At Taller's direction, until approximately August 25, 2020, Vision Holdings continued to disseminate PPMs falsely representing that Accounting Firm A was its Auditors.  On August 26, 2020, Vision Holdings changed its PPM to state that it was "in the process" of engaging an auditor.

49.      Vision Holdings' financial statements were never audited.

50.      Between January 19, 2020, and August 25, 2020—when the PPMs falsely represented that Accounting Firm A was serving as Vision Holdings' Auditors and that the Fund had an Audit Committee—investors invested more than $5.5 million in Vision Holdings.

51.      The lack of an auditor and an Audit Committee is information that reasonable investors would have wanted to know before making an investment in Vision Holdings.

II.  **TALLER DIRECTED STHEALTH CAPITAL AND VISION HOLDINGS TO MAKE LOANS TO COMPANIES IN WHICH TALLER HAD UNDISCLOSED CONFLICTS OF INTEREST**

52.     Between May 2020 and January 2021—while serving as CEO to both StHealth Capital and Vision Holdings, and while acting as an investment adviser to each through StHealth Advisors and Vision Advisors—Taller directed StHealth Capital and Vision Holdings to loan a total of approximately $21.875 million to two companies (Company A and Company B) in which he had an undisclosed financial interest (collectively, the "Loans").

53.     Taller did not disclose this conflict of interest to StHealth Capital's Board of Directors, StHealth Capital's investors, or to Vision Holdings' investors.  There were no other participating members of Vision Holdings' Board of Directors at that time.

54.     Taller arranged for the companies that received the Loans to invest in crypto assets pursuant to an agreement whereby Taller's company Consorcia would receive "management fees" on the gains in those assets.  By doing so, Taller created another direct, undisclosed conflict of interest between his own interests and those of StHealth Capital and Vision Holdings.

   A.  **StHealth Advisors and Taller Were Both Investment Advisers to StHealth Capital**

55.     StHealth Advisors and Taller were both investment advisers to StHealth Capital as defined in the Advisers Act and the ICA.

56.     StHealth Advisors was—for compensation and pursuant to a written advisory agreement dated August 7, 2018 ("StHealth Advisory Agreement")—in the business of advising StHealth Capital as to the value of securities and/or as to the advisability of investing in, purchasing, or selling securities.

57.     The StHealth Advisory Agreement provided that StHealth Advisors' duties included: "(i) determin[ing] the composition and allocation of the portfolio of [StHealth Capital], the nature and timing of the changes therein, and the manner of implementing such changes; (ii) identify[ing],

evaluat[ing] and negotiat[ing] the structure of the investments made by [StHealth Capital]; (iii) execut[ing], monitor[ing] and service[ing] [StHealth Capital]'s investments; (iv) determin[ing] the securities and other assets that [StHealth Capital] shall purchase, retain, or sell; (v) perform[ing] due diligence on prospective portfolio companies; and (vi) provid[ing] [StHealth Capital] with such other investment advisory, research and related services as [StHealth Capital] may, from time to time, reasonably request or require for the investment of its funds."

58.    Pursuant to StHealth Advisory Agreement, StHealth Advisors was entitled to compensation for its investment advisory services and reimbursement of its expenses incurred on StHealth Capital's behalf.

59.    Between approximately May 2019 and January 2022, StHealth Capital paid StHealth Advisors, and therefore Taller, for expenses it purportedly incurred on StHealth Capital's behalf.

60.    Through Taller, StHealth Advisors regularly furnished advice to StHealth Capital concerning the desirability of investing in, purchasing, or selling securities or other property.

61.    Taller also personally acted as an investment adviser to StHealth Capital. As CEO of StHealth Advisors, and through his ownership and control of StHealth Advisors, Taller directed the management and policies of StHealth Advisors.

62.    Among other things, Taller personally advised StHealth Capital concerning which investments to make and directed the purchase and sale of its securities. For example, Taller recommended that StHealth Capital invest in Company A, and he approved that investment.

63.    Taller, through his alter ego entities—*i.e.*, StHealth Advisors and other entities he solely owned—received compensation in the form of reimbursement of expenses for advising StHealth Capital.

64.    As investment advisers to StHealth Capital, both StHealth Advisors and Taller were fiduciaries to StHealth Capital and, thus, owed StHealth Capital affirmative duties of utmost good faith and full and fair disclosure of all material facts.

65.    StHealth Advisors and Taller each also had an affirmative duty to employ reasonable care to avoid misleading StHealth Capital, and to act in StHealth Capital's best interest.

66.    StHealth Advisors and Taller each had a duty to eliminate, or at least disclose, all conflicts of interest which might incline them—consciously or unconsciously—to render advice which was not disinterested.

67.    As explained in paragraphs 90 to 120, and 124 to 131 below, Taller breached his fiduciary duties to StHealth Capital by (1) failing to make full and fair disclosure when he invested StHealth Capital's assets in a portfolio company despite his personal interests in that company; and (2) misappropriating money from StHealth Capital through improper expense reimbursements.

**B.    Vision Advisors and Taller Were Both Investment Advisers to Vision Holdings**

68.    Vision Advisors and Taller were both investment advisers to Vision Holdings as defined in the Advisers Act.

69.    Vision Advisors was—for compensation and pursuant to written investment advisory agreements dated June 23, 2020 (effective March 31, 2020), and May 14, 2022 (the "Vision Advisory Agreements")—in the business of advising Vision Holdings as to the value of securities and/or as to the advisability of investing in, purchasing, or selling securities.

70.    The Vision Advisory Agreements provided that Vision Advisors' duties included: "(i) provid[ing] recommendations regarding the composition and allocation of the portfolio of [Vision Holdings], the nature and timing of the changes therein and the manner of implementing such changes; (ii) identify[ing] and evaluat[ing] the structure of the loans made by [Vision Holdings], and mak[ing] recommendations regarding the same; (iii) monitor[ing] and servic[ing] [Vision Holdings]'s

14

loans and other investments; (iv) mak[ing] recommendations regarding the loan, securities and other assets that [Vision Holdings] shall purchase, retain, or sell; (v) perform[ing] due diligence on prospective portfolio companies; and (vi) provid[ing] [Vision Holdings] with such other lending, investment advisory, research and related services as [Vision Holdings] may, from time to time, reasonably request or require for the investment of its funds."

71.     Pursuant to the Vision Advisory Agreements, Vision Advisors was entitled to compensation for the investment advisory services it provided.

72.     Between July 20, 2020, and December 29, 2023, at Taller's direction, Vision Holdings paid more than $1.6 million in management fees to entities owned by Taller.

73.     The Vision Advisory Agreements also entitled Vision Advisors to reimbursement of expenses that Vision Advisors incurred on Vision Holdings' behalf.

74.     Vision Holdings paid at least $77,000 to affiliates of Vision Advisors for reimbursement of expenses.

75.     Taller also acted as an investment adviser to Vision Holdings.  As CEO of Vision Advisors, and through his sole ownership and control of Vision Advisors, Taller directed the management and policies of Vision Advisors.

76.     Among other things, Taller advised Vision Holdings about which investments to make and directed the purchase and sale of securities.  For example, Taller recommended that Vision Holdings invest in Company A and Company B, and he approved the investments.

77.     Taller received compensation for advising Vision Holdings concerning its investments, through his entities to which Vision Holdings paid the management fees due to Vision Advisors for its advisory services.  Taller also received compensation for advising Vision Holdings concerning its investments, through his entities to which Vision Holdings paid the reimbursement of expenses.

78.    As investment advisers, both Vision Advisors and Taller were fiduciaries to Vision Holdings and, thus, owed Vision Holdings affirmative duties of upmost good faith and full and fair disclosure of all material facts.

79.    Vision Advisors and Taller each also had an affirmative duty to employ reasonable care to avoid misleading Vision Holdings, and to act in Vision Holdings' best interest.

80.    Vision Advisors and Taller each had a duty to eliminate, or at least disclose, all conflicts of interest which might incline them—consciously or unconsciously—to render advice which was not disinterested.

81.    As explained in paragraphs 90 to 124, and 132 to 142 below, Taller breached his fiduciary duties to the Vision Holdings by (1) failing to make full and fair disclosure when he invested a substantial portion of Vision Holdings' assets in portfolio companies despite his personal interests in those companies; and (2) by misappropriating assets from Vision Holdings.

### C.    Taller Controlled Both StHealth Capital and Vision Holdings

82.    Taller controlled both StHealth Capital and Vision Holdings.

83.    Taller also owned and controlled StHealth Advisors, which had a contractual advisory agreement with StHealth Capital that gave StHealth Advisors broad duties and responsibilities with respect to advising StHealth Capital.

84.    StHealth Capital's PPMs stated that StHealth Advisors would be subject to overall supervision by StHealth Capital's three-person Board of Directors, of which Taller served as Chairman.  In practice, however, Taller exercised control over the investment decisions of StHealth Capital; he was StHealth Advisors' sole source of investment advice and had ultimate influence and discretion over StHealth Capital's investments.  Furthermore, when Taller consulted with the other BDC directors regarding investments, he was commandeering and dominating in his persuasiveness, and StHealth Capital ultimately made investments recommended by Taller.

85.     Taller also owned and controlled Vision Advisors, which had written contractual advisory agreements with Vision Holdings, which gave Vision Advisors broad duties and responsibilities with respect to advising Vision Holdings.  Taller signed those agreements on behalf of Vision Advisors, and he also countersigned one of the agreements on behalf of Vision Holdings.

86.     Although the Vision Advisory Agreements purported to give Vision Advisors "non-discretionary" authority—and although Vision Holdings' PPMs stated that Vision Advisors would be subject to overall supervision by Vision Holdings' Board of Directors—from December 2019 to August 2021, Vision Holdings had no functioning Board of Directors, and Taller exercised complete control over Vision Holdings' investment decisions.

87.     From December 2019 to August 2021, Taller was Vision Holdings' sole source of investment advice, served as an officer as well as the sole director for Vision Holdings, and had discretion over Vision Holdings' investments.

88.     Even after August 2021—when Vision Holdings formed a board with independent directors—Taller continued to control Vision Holdings and continued to exercise sole discretion over its investment decisions.  For example, in October 2022, Taller unilaterally liquidated approximately 40% of Vision Holdings' brokerage account without informing Vision Holdings' Board of Directors.

89.     In general, any Board approval for Taller's recommended investments was a mere formality and was never withheld.

**D.     Taller Acquired an Interest in Company A and, Days Later, Directed StHealth Capital and Vision Holdings to Loan Money to Company A**

90.     On or about May 1, 2020, Taller created an irrevocable trust that named Taller's three children as its beneficiaries (the "Trust").

91.     On or about April 29, 2020, Company A's parent transferred 19,200 of Company A's preferred membership interests to the Trust for the stated consideration of $1,000 pursuant to a Membership Interest Purchase Agreement.

92.     Following this transaction, the Trust owned approximately 2% of Company A, which had a book value of approximately $23 million.

93.     Days later, on or about May 4, 2020, Taller directed StHealth Capital to enter into a purchase agreement with Company A for a $200,000 promissory note convertible into shares of Company A.  Taller signed the purchase agreement on behalf of StHealth Capital.  StHealth Capital transferred $200,000 to Company A.

94.     Simultaneously, Taller directed Vision Holdings to enter into a purchase agreement with Company A for a $1.8 million promissory note convertible into shares of Company A.  Taller signed the purchase agreement on behalf of Vision Holdings.  Vision Holdings transferred $1.8 million to Company A.

95.     Taller did not disclose to StHealth Capital's Board of Directors or its investors that the Trust had acquired an interest in Company A immediately prior to StHealth Capital's loan investment.  Nor did Taller disclose to Vision Holdings' investors (Vision Holdings had no functioning Board of Directors at the time) that the Trust had acquired an interest in Company A immediately prior to Vision Holdings' loan investment.

96.     Moreover—by virtue StHealth Capital's and Vision Holdings' relationship to each other, by and through Taller and entities under his control—StHealth Capital's and Vision Holdings' simultaneous loans to Company A constituted "joint" arrangements under Section 57 of the ICA.  Specifically, Taller and StHealth Advisors are affiliated persons of StHealth Capital, within the meaning of Section 57 of the ICA, because Taller was a director and officer of StHealth Capital, and StHealth Advisors was StHealth Capital's investment adviser pursuant to contract.  Taller, StHealth

Advisors, and Vision Advisors are also affiliated persons of StHealth Capital by virtue of Taller's common control of StHealth Advisors and Vision Advisors. Additionally, StHealth Capital and Vision Holdings were affiliated by virtue of Taller's common control. Their investment advisers, StHealth Advisors and Vision Advisors, were alter egos of Taller, their owner, CEO, and sole source of investment advice. Taller exercised managerial control over StHealth Capital and Vision Holdings, and Taller made their investment decisions.

97.    Under ICA Rule 17d-1, joint arrangements include any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking whereby a registered investment company—such as a BDC—and any affiliated person have a joint or joint and several participation, or share in the profits of such enterprise or undertaking. Even a loose combination of transactions can qualify as a joint arrangement.

98.    Thus, pursuant to Rule 17d-1 of the ICA, StHealth Capital was required to file an application with the SEC and await the granting of an SEC order prior to such transaction.

99.    StHealth Capital never applied for and never received the requisite SEC order.

**E.    Taller Directed Vision Holdings to Make Additional Loans to Company A and Company B, While Engaging in his Own Undisclosed Business with Company A and Company B**

100.    Company A was largely dependent on Vision Holdings for operating capital.

101.    Throughout 2020 and early 2021, Taller directed Vision Holdings to make additional loans to Company A and to its affiliate, Company B.

102.    In addition to the $1.8 million it loaned on May 4, 2020, Taller directed Vision Holdings to loan Company A the following amounts, which were transferred from Vision Holdings to Company A, for a cumulative total of $19.3 million:

| | |
|---|---|
| August 18, 2020: | $2,000,000; |
| August 31, 2020: | $2,000,000; |
| September 11, 2020: | $2,000,000; |
| September 28, 2020: | $2,000,000; |

| | |
|---|---|
| October 22, 2020: | $2,000,000; |
| November 5, 2020: | $2,000,000; |
| November 10, 2020: | $1,000,000; |
| January 22, 2021: | $4,500,000. |

103.    On September 2, 2020, Taller directed Vision Holdings to enter into a loan and security agreement with Company B.  Pursuant to that agreement, between September and December 2020, Vision Holdings loaned Company B the following amounts, which were transferred from Vision Holdings to Company B, for a cumulative total of $2.375 million:

| | |
|---|---|
| September 2, 2020: | $625,000; |
| October 1, 2020: | $625,000; |
| October 30, 2020: | $625,000; |
| December 3, 2020: | $500,000. |

104.    While he was directing Vision Holdings to make the above loans, Taller did not disclose the Trust's ownership interest in Company A to Vision Holdings' shareholders.  Vision Holdings had no functioning Board of Directors at the time.

105.    In addition, while Taller was continuing to direct Vision Holdings to loan money to Company A and Company B, Taller deepened his interests in those companies and their affiliates, creating greater conflicts of interest between himself and his advisory client, Vision Holdings.

106.    Specifically, on or about September 20, 2020, Taller directed his company Consorcia to enter into a contractual agreement with Company A's principal for the purpose of "developing the business interests of [the principal] and those of any of his Affiliated entities" ("Consorcia Agreement I").

107.    Consorcia Agreement I noted that Consorcia had assisted Company B in "secur[ing] financing of various forms in a series of transactions."

108.    Consorcia Agreement I entitled Consorcia to a 10% "Successor Ownership Interest" in certain Company B assets upon a successful refinancing thereof.

109.    On or about October 15, 2020, Taller directed Consorcia to enter into a contractual agreement with Company B and Company C, both affiliates of Company A ("Consorcia Agreement II").

110.    Consorcia Agreement II provided that Consorcia would "facilitate business alliances and manage the relationship between [Company B and Company C] and various third-party providers of cryptocurrency-related services."  The agreement entitled Consorcia to a 45% management fee on any gain on the net value of digital assets purchased pursuant to the agreement.

111.    Between September and November 2020, Company B transferred $375,000 to Consorcia, which Consorcia used to purchase crypto assets.

112.    Between October 2020 and January 2021, Company C purchased $1.6 million in crypto assets.

113.    In all, Taller helped orchestrate $1.975 million in crypto asset purchases by Company B and Company C.

114.    Taller never disclosed to StHealth Capital's Board of Directors or investors or to Vision Holdings' investors (Vision Holdings had no functioning Board of Directors at the time) that he stood to profit from facilitating Company B's and Company C's purchases of crypto assets, or that this created a conflict of interest.

115.    Nor did Taller disclose the conflicts of interest created by the fact that he would personally profit from Company A's and its affiliates' purchases of crypto assets.

116.    Finally, between October 21, 2020 and February 4, 2021, Taller directed certain entities that he solely owned to enter into other transactions with Company A and Company B, without disclosing these transactions (or the conflicts of interest they created) to Vision Holdings' shareholders (Vision Holdings had no functioning Board of Directors at the time).

117.    Company A and Company B ultimately defaulted on the Loans.

118.    In September 2021, Vision Holdings sued Company A and its principal for loan repayment.

119.    Although Vision Holdings secured judgments in its favor, it was unable to recoup the value of its loans to Company A and Company B, losing more than $21 million in principal, plus interest.

120.    StHealth Capital, which did not sue Company A, lost the entirety of its $200,000 loan to Company A.

## III.    TALLER MISAPPROPRIATED FUNDS FROM STHEALTH CAPITAL AND VISION HOLDINGS

### A.    Taller Misappropriated $200,000 from Vision Holdings

121.    On or about June 15, 2021 (while Vision Holdings had no functioning Board of Directors), Taller directed Vision Holdings to transfer $200,000 to his company, VBB Management.

122.    On or about July 6, 2021, Taller comingled those funds with $50,000 from one of his companies, Consorcia, and used the combined sum to purchase crypto assets in the account of VBB Management.

123.    Taller did not return the $200,000 that he misappropriated from Vision Holdings.

### B.    Taller Misappropriated Approximately $286,000 from StHealth Capital and Approximately $305,000 from Vision Holdings

124.    Taller exploited his positions in StHealth Capital and Vision Holdings, and their lack of oversight over his activities, to charge inappropriate expenses to StHealth Capital and, when discovered, to direct Vision Holdings to reimburse those expenses with investors' money.

### Misappropriation from StHealth Capital

125.    Under StHealth Advisory Agreement, StHealth Advisors was entitled to reimbursement of expenses incurred on StHealth Capital's behalf.

126.    Between 2019 and 2022, StHealth Capital paid StHealth Advisors, and/or affiliated entities that Taller owned, the following amounts for expense reimbursement:

>   2019:  $77,999;
>   2020:  $146,949;
>   2021:  $139,974;
>   2022:  $25,000

127.    In fact, however, certain of these amounts were not expenses of StHealth Capital, and Taller should not have charged StHealth Capital for those amounts.

128.    Beginning in or around April 2022, StHealth Capital's Board of Directors undertook a review to determine whether StHealth Advisors or its affiliated entities had overcharged StHealth Capital for expense reimbursements (the "Review"). The Review, which concluded in or around August 2022, determined that StHealth Capital had improperly paid Taller's entities expense reimbursements of the following amounts: $35,919 in 2019; $120,460 in 2020; $105,587 in 2021; and $25,000 in 2022. The Review also determined that interest on the improper reimbursements was $18,743.

129.    The Review determined that the correct expenses that should have been allocated to StHealth Capital from 2019 to 2022 were as follows:

>   2019:  $42,080;
>   2020:  $26,489;
>   2021:  $34,387;
>   2022:  $0

130.    A November 2024 independent audit confirmed the Review's determinations.

131.    In total, Taller and his entities improperly charged StHealth Capital approximately $286,966 for expense reimbursement to which they were not entitled.

**Misappropriation from Vision Holdings to Reimburse StHealth Capital**

132.    Rather than reimburse StHealth Capital for the expenses he and his entities had improperly charged to StHealth Capital himself, Taller directed Vision Holdings to reimburse StHealth Capital for these expenses.

133.    Thus, on or about April 22, 2022, Taller directed Vision Holdings to pay StHealth Capital $105,587 for the expenses his entities had improperly charged StHealth Capital in 2021.

134.    StHealth Capital and Vision Holdings are legally separate entities that do not share a contractual relationship whereby one can directly request reimbursement of expenses from the other.

135.    Nevertheless, Vision Holdings paid $105,587 to StHealth Capital on or about April 22, 2022.

136.    Taller did not consult Vision Holdings' Board of Directors prior to authorizing the April 22, 2022 payment of $105,587 from Vision Holdings to StHealth Capital.

137.    As to the remaining $200,122 that Taller and his entities had improperly charged to StHealth Capital (consisting of the overcharges for 2019, 2020, 2022, and $18,743 in interest), Taller again directed that Vision Holdings make that payment.

138.    On or about October 13, 2022, Taller directed Vision Holdings to transfer $200,200 to his personal attorneys' trust account.  On or about October 25, 2022, Taller directed that $200,122 be transferred from the attorneys' trust account to StHealth Capital.

139.    According to the Vision Advisory Agreements, to receive reimbursement for expenses from Vision Holdings, Vision Advisors should have prepared and delivered a statement documenting the expenses that it or its affiliates incurred on Vision Holdings' behalf.  Taller did not submit documentation to Vision Holdings' Board of Directors stating that the $200,122 were expenses incurred on behalf of Vision Holdings.

140.    Vision Holdings' Board of Directors did not adopt a resolution or written consent authorizing the payment of $200,200 to StHealth Capital.

141.    Nevertheless, Taller directed the $200,200 payment from Vision Holdings.

142.    In total, Taller improperly charged $286,966 to StHealth Capital, and Taller improperly transferred $305,787 ($105,587 plus $200,200) from Vision Holdings to reimburse StHealth Capital.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

143.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 54, 68 through 124, and 132 through 142.

144.    By engaging in the conduct described above with respect to Vision Holdings, Defendant, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, directly or indirectly: (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud; (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

145.    By reason of the foregoing, Defendant Taller violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

146.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 54, 68 through 124, and 132 through 142.

147.    By engaging in the conduct described above with respect to Vision Holdings, Defendant directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or: (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

148.    By reason of the foregoing, Defendant Taller, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Advisers Act Sections 206(1) and (2)**

149.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 142.

150.    At all relevant times, Defendant was an investment adviser to StHealth Capital and to Vision Holdings under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

151.    By engaging in the conduct described above with respect to both StHealth Capital and Vision Holdings, and in breach of his fiduciary duties to StHealth Capital and Vision Holdings, Defendant, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud

any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

152.    By reason of the foregoing, Defendant Taller, directly or indirectly, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FOURTH CLAIM FOR RELIEF
### Violations of Investment Company Act Section 57(a)(4) and Rule 17d-1 Thereunder

153.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 24 and 52 through 99.

154.    By engaging in the conduct described above with respect to StHealth Capital, Defendant Taller, while an affiliated person of StHealth Capital, acting as principal, participated in, or effected a transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which StHealth Capital was a participant.  "Joint enterprise or other joint arrangement or profit-sharing plan" is defined in ICA Rule 17d-1, which applies to ICA Section 57(a)(4) pursuant to Section 57(i), to include any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking whereby a registered investment company and any affiliated person have a joint or joint and several participation, or share in the profits of such enterprise or undertaking.

155.    By reason of the forgoing, Defendant Taller violated, and unless enjoined and restrained will continue to violate, Section 57(a)(4) of the ICA [15 U.S.C. § 80a-56(a)(4)] and ICA Rule 17d-1 [17 C.F.R. § 270.17d-1].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons, including entities, in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)], Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and ICA Section 57(a)(4) [15 U.S.C. § 80a-56(a)(4)] and Rule 17d-1 [17 C.F.R. § 270.17d-1] thereunder.

### II.

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### III.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], Advisers Act Section 209(e) [15 U.S.C. § 80b–9(e)], and ICA Section 42(e) [15 U.S. Code § 80a–41(e)].

### IV.

Permanently prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)].

## V.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.


Dated:  New York, New York
          April 29, 2025

                                    _____/s/ Todd D. Brody_____
                                    Todd D. Brody
                                    Thomas J. Smith, Jr.
                                    Alison Conn
                                    Wesley W. Wintermyer (not admitted)
                                    Attorneys for Plaintiff
                                    SECURITIES AND EXCHANGE COMMISSION
                                    New York Regional Office
                                    100 Pearl Street, Suite 20-100
                                    New York, NY 10004-2616
                                    (212) 336-0080 (Brody)
                                    brodyt@sec.gov